Good morning, your honors, and may it please the court, my name is Jonathan Baldoff and I represent the appellant, Donald Herrick. I would like to reserve three minutes for rebuttal if I may. Mr. Herrick has two cases before the court today, both regarding the constitutional rights of detainees, especially pre-trial civil detainees. Mr. Herrick necessarily retains more of his rights than a convicted prisoner would, and the state has violated some of those rights. The order granting summary judgment should be reversed, and this case should be granted for additional proceedings, because genuine issues of material fact still remain. Mr. Herrick is not a prisoner, and therefore Turner is not directly on point. And even under Turner, the arbitrary nature of the defendant's actions and policies violate Mr. Herrick's constitutional rights. To my first point, there are a number of issues that present genuine issues of material disagreement and facts. In this case, viewing the evidence in the light most favorable to my client, a few immediately stand out. First, the arbitrary and capricious destruction of Mr. Herrick's personal mail. Second, the staff's viewing of Mr. Herrick's privileged legal mail. And finally, the policies either followed or not followed by the staff to violate those rights. Simply, there are issues of material fact regarding the defendant's conduct and motives. Part of the order granting summary judgment also referred to qualified immunity. Qualified immunity is not appropriate in this case for a number of reasons. First, it has long been established that even a prisoner's mail, absent a security interest and without appropriate institutional safeguards, is a violation of a prisoner's First Amendment rights. Mr. Herrick is not a prisoner. He is a civil detainee.  Yes, ma'am. And I'm going to have the same question across the board. But it just seems to me all of the analogies being made to the civil detainee status are somewhat different in this case. Because we know, if nothing else, that the nature of the facility he's in, he's detained. And he's detained in a special type of facility. That's going to dictate what is or is not permissible. You would agree with that, surely? Yes, Your Honor. Only limiting to, I would believe, the only interest that the State can use to justify its actions under Turner would be security of the institution. Well, we've also got a question. One of them is certainly security of the institution and of the people who are living there, for sure. But this person was there for a very long time, and that's typical in these cases, awaiting adjudication. And during that time, my question is whether or not this person does or does not have a treatment plan. I don't know off the top of my head, Your Honor. I'd be happy to supplement if. Well, this is why it's important. We have, in our record, no treatment plan, I don't think. I couldn't find one. But we have an addenda to a treatment plan. And I can't think that somebody's there eight years without a treatment plan. But I think, again, this would be extra record. There's flavors of it in this case, that there's a treatment plan. And it's very common for a person in this circumstance, awaiting adjudication, to not work that treatment plan on advice of counsel prior to the hearing. And I'm guessing that's what it is. But it is a guess that that's the status that your client is in. And the reason it matters is because that's the lens through which I'm going to be looking at the reasonableness of all of these conditions. So I wanted to give you that heads up. And to be clear, Your Honor, means, and I don't mean to ask you a question. Please don't take offense. But you mean that rehabilitation might be an issue if a treatment plan is in place. Right. I don't have an answer to that, so I can't speak to that. Okay. I do recall that there was, yes, there was an amendment to the treatment plan. But I don't know if there was an official treatment plan or how that has been going on. Okay. Going back to the issues regarding qualified immunity, SASIA talks about clearly established rights. And as the Court knows, there's no need to identify kind of a particular action. But going, you know, this destruction of the mail, looking through it, I think it can be said that this is clearly established rights. Prisoners have a right to their mail. And, again, once the law is clearly established, the immunity defense orderly should fail, since a reasonably competent public official should know the law regarding their own conduct. Second, regarding qualified immunity, there is a lack of evidence regarding the professional qualifications of the decision-makers in this case, required by Houghton and Youngberg. Only one appellee provided the information regarding her qualifications, and it was limited mostly to titles. No evidence was given regarding her decision-making process. Mr. Herrick was essentially arguing that he's subject to arbitrary treatment. The best counter to that argument would be, well, no, he's not. This is how we came to these decisions. This is how we made these decisions, and this is how we apply these decisions. None of that is in the record. It should also be noted that professional judgment does not necessarily imply degrees and decades of experience, but can simply mean, you know, this person is properly trained and is thoughtful in their job and how to do their job. And then, of course, finally, as the Court is aware, Mr. Herrick's request for equitable relief borrows qualified immunity in those claims. To my discussion of Turner, Mr. Herrick is not a prisoner. So Turner, the framework of Turner might be applicable in a very narrow sense. And what I mean by that is that Mr. Herrick's position requires the State to justify what they're doing and their reasoning. So the deference that Turner gives and allows the Court to say, well, you know, this decision doesn't argue arbitrary, that shouldn't be the case. The State should be explaining what they're doing and why they're doing it. And that tracks with Youngberg. You know, it looks to the due process clause in the 14th Amendment to determine the rights of a civil detainee. So put simply, Turner is not directly on point. It should be more narrow because he is a civil detainee. But even under Turner, defendant's actions violate Mr. Herrick's constitutional rights. For example, looking to the mail issue. There is no rational and valid connection between the arbitrary destruction of Mr. Herrick's mail and the security of the facility. There are no alternative means for Mr. Herrick to exercise those rights. There may be some costs associated with properly dealing with the mail, but frankly, those are the costs of running the facility.  And finally, there are clearly ready alternatives because Washington's convicted prisoners have a more consistent policy in regards to their mail. Finally. What's the situation with the mail now? I don't actually know off the top of my head, Your Honor. I thought there was a policy change. There have been many policy changes regarding how the mail has been handled and how it's going on. Well, doesn't that matter in terms of whether certain of these things are moot at this point? And you say there's factual issues, but I don't know what those factual issues are. The larger concern we would have is that they're constantly, these policies are constantly in flux. There is no yes, this is the policy. It seems kind of an ad hoc position where, hey, something comes up. Oh, well, okay, we talked to counsel. We might want to fix that. So laying through kind of those policies change, there's no, you know, kind of permanent locking in of yes, this is the right policy, this is how we maintain people's constitutional rights. Well, that's sort of penalizing the state for responding to a complaint, basically. You're saying, well, they changed their policy, but maybe they'll change it again. Is that your argument? Simply yes, but I would look to the last five years that Mr. Herrick experienced that kind of thing. These policies have changed, have been in flux. And, yes, I'm sure the state has been trying to put policies in place that preserve Mr. Herrick's and the other residents' constitutional rights, but they haven't gotten there so far. Well, what's missing at this point? My understanding is that besides the kind of mail policy being in place, I think that there is a whether or not that that's actually been kind of looked through, and it's kind of using, sorry, to be totally unclear. It's whether or not that policy is actually being held to, and those violations are still happening is my understanding, but the policy may have changed as it goes. Well, that leaves me nowhere because I don't know if I'm looking at the record that that's a basis for reversing. What I'm looking at is the record, the policy, the status, and whether to affirm or reverse the district court. And your last statement doesn't help me get there, so maybe you want to be a little more precise. Yes, Your Honor. I believe that the policies may have changed. Those policies are not. May? May have? May have, yes. I don't have evidence in front of me. I don't have a record regarding that. And that would be without the evidence, what are we supposed to do? I would look back again to the fact that there are a number of issues that are raised. We don't have much in the way of evidence regarding that they have been changed, so looking at the status quo as the case was when the motion for summary judgment was granted, looking to that, there were some issues and constitutional violations in this case. And finally, we would ask that following Jones v. Blattis, that counsel would be appointed if this case is remanded to help narrow the issues in discovery and help resolve some of the issues regarding the disagreements in discovery. With that, I'd like to reserve the remaining of my time if I could. You may. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Greg Zeiser. I'm an Assistant Attorney General. I'm joined at council table by Assistant Attorney General Josh Weir. And I'd like to begin by talking about the reasons why this Court should affirm the trial court decision. There are three reasons why this Court should affirm the dismissal of Mr. Herrick's claims. Number one, the trial court correctly applied the Turner test to Mr. Herrick's mail and property claims. Number two, all defendants are entitled to qualified immunity given the current state of the law. And number three, the arguments that Mr. Herrick does make on appeal were not presented to the trial court and do not need to be considered by this Court. This Court could affirm on the basis of the clearly established prong of qualified immunity alone. That's the most efficient way to resolve this appeal. But if it were to consider ---- Can we go back to that for a minute, please? Certainly. So if you want to argue that there's no clearly established law, what are we looking at here? Are these First Amendment claims or Fourteenth Amendment substantive due process claims? At one point it looks like a procedural due process claim to me. I think there's a real question about how these claims are best understood. Could I get your take on that? Sure. Certainly. The complaint is sort of scattershot in terms of what constitutional rights are being asserted. What may be helpful to the Court is that Turner doesn't talk about its test being applicable only to the First Amendment right. It is more concerned from an institutional interest perspective. I appreciate what Turner does or doesn't do. I understand there's a question about which standard we're going to apply, and I'm not sure it's going to matter to me. I'm just trying to figure out how the State interprets these claims. Do you treat them as First Amendment or Fourteenth Amendment claims, or are you telling me you don't think it matters? Ultimately, I don't think it matters. I read them as primarily First Amendment claims. But given Turner and the way that Turner has been applied to substantive due process claims, First Amendment claims, Fourth Amendment claims, the Court and Turner was very clear that it applies broadly regardless of the right that's at issue. Okay, so one of these claims, I think, is that Mr. Herrick's constitutional rights were violated when he was transferred to the IMU following an alleged assault. You're not treating that as a First Amendment claim, are you? Well, no, Your Honor, and the reason being is that that gets more to the heart of the Youngberg case. Okay, so in that case, again, that's why I'm just trying to figure out what you think this claim is. If you're treating that one as a Fourteenth Amendment, as a substantive due process claim, you would concede then that Youngberg applies, I think, but I fully appreciate you think it doesn't matter to the outcome. I'm just trying to make sure how you treat it. Certainly. Our position is that the Turner test applies to the mail and property claims and that Youngberg applies to the IMU claim. Okay. All right. Could I ask, between the two cases, there's an IMU and then there's an ALDER unit, and is the Intensive Management Unit the same thing as the ALDER unit? I think there's a physical relationship between the two, but being in IMU is not the same thing as being on the ALDER unit. Oh, those are two different things. Okay, thank you. So I want to emphasize the three reasons why this Court should apply Turner as the standard for claims brought by civil detainees in this context. Number one, recognizing Turner would be consistent with the Supreme Court's guidance that detention facilities are entitled to considerable deference, whether they house criminal detainees, as in the case of Turner, whether they house pretrial detainees, as in the case of Bell, or whether they house civil detainees, as in the case of Youngberg. The common thread of all those cases is that the institution is entitled to deference in its decision-making about how to run the institution. But it's not unlimited. Do these people have treatment plans when they're in the – whichever unit they're housed in, when they're in the phase of the proceedings that is still pre-adjudication, do they have treatment plans? There's nothing in the record about that. Well, there's an addenda to a treatment plan, Counsel. And I'm just struggling to imagine that someone is sitting waiting for eight years for a hearing without a treatment plan. But if that's the position, that would be very helpful for me to know. Well, it's optional whether pretrial civil detainees at the Special Commitment Center participate in treatment. They're free to. And if they choose to, they will get those sort of benefits. That's different. I'm sure you can't force somebody to participate. I'm just trying to figure – it doesn't sound optional to me whether the state provides one. That certainly wouldn't be consistent with our jurisprudence, as I understand it. So it's important for me to know whether the state's taking the position that these people don't – the state doesn't have to provide treatment plans. Am I misunderstanding you? I do not believe the state is required to. I think there may be sort of pro forma documents that are created for these individuals that resemble that. But it's certainly optional whether they want to participate in treatment. You've answered my question. Your answer is that you don't think that the state's required to provide a treatment plan while they're awaiting their hearing, as I understand it. That's correct. All right. And in addition to being consistent with the guidance that the Supreme Court has provided regarding this issue, there are six other circuits, at least, that have recognized that Turner should be the standard for these types of mail and property claims as applied to civil detainees, including a case involving a pretrial detainee, if the distinction is important to the court. Further, this court has also strongly suggested that Turner should be the test. And Heydrich v. Hunter, granted, that was more of a qualified immunity case where there wasn't an explicit adoption of Turner being the standard for a First Amendment claim. But there was a strong approval stated in that case that Turner should be recognized as the standard. And it's also consistent with this court's pretrial criminal detention cases. There have been multiple instances where this court has recognized that Turner is the appropriate standard for reviewing mail and property claims for that population as well. If that's the case, sir, Could we talk about why these particular policies at SEC are consistent with the security needs of the facility? Is there a particular policy you'd like me to focus on, Your Honor? He's only challenging three or four. That seems to be your blanket response, and I don't mean that pejoratively, but if you could apply them to these and explain to me why these policies are required because of the nature of the facility and the security needs, that would be helpful to me. Certainly. We can talk about the return address labeling requirement, which incidentally is no longer in effect. The record reflects that that policy was changed. Well, if it's no longer in effect, then how about if we talk about one that is? Can we talk about a policy that remains in effect? There are certainly restrictions that are placed on incoming property, periodicals, that sort of thing, for clinical reasons to maintain the therapeutic milieu of the institution. Of course, when you're housing a population of approximately 200 sexually violent predators and those awaiting trial for that purpose, maintaining a therapeutic milieu is of paramount importance. Right. So do we look for that in the declarations that were filed by the state? Well, there's nothing that really gets into that level of detail in the declarations that were filed by the state. But I think it's ultimately the burden on the plaintiff to show that there's not a rational relationship between the asserted government interest and the policies that are at issue. And I think it's eminently rational and reasonable for the SEC to exercise tight control over the materials that are coming into the facility. And there's been no evidence introduced into the record to show the contrary. I want to pick up on- I'd like to make sure that we get all these policies on the table. So the return mail issue has had the policy changed, correct? That's correct, Your Honor. And how about the scanning of the mail, even if the legal mail is a disk? Has that policy been changed? Yes, Your Honor. That policy has been changed so that if the disk comes into the facility from the attorney, it meets labeling requirements, it is given to the resident without any sort of scan or search. So then is there any other policy that was challenged that has now been changed? Not in the record. I can answer off the record. Well, that doesn't do us too much good without some kind of supplemental citation and an opportunity to answer. No, Your Honor. The only policy change that's shown in the record is the mail policy. Thank you. I want to respond to counsel's argument about the Houghton case and that professional judgment should be the standard that applies to the mail and property claims and that defendants have some sort of affirmative burden to come forth with their credentials in order to be entitled to qualified immunity. Besides the fact that that argument was not made below, there are two other really fundamental problems with that position. Number one, there's no authority to support the idea that Youngberg applies to mail and property claims of the sort that Mr. Herrick has been asserting in this case. Youngberg, of course, was a case involving physical restraint and ensuring safety on the wards. I'm not aware of a case where the Youngberg professional judgment standard has been extended to a case involving a First Amendment claim involving mail and property. Second, and maybe even more fundamentally, is the idea that defendants have to produce some sort of evidence in these cases to obtain summary judgment when they do not bear the burden of proof in these cases. It's well established that plaintiffs must prove a violation of their constitutional rights. I think it would be odd to say that defendants are obliged to show that a plaintiff's constitutional rights were not violated. That is consistent with the Supreme Court guidance in the Pearson case and other decisions by this Court that the plaintiff bears the burden of showing a violation of constitutional rights. So to the extent that Houghton suggests otherwise, I think Houghton should really be treated as an outlier in a case that hasn't had the benefit of the following 25 years of jurisprudence on the issue of qualified immunity. So how would he go about doing that? How would a hypothetical detainee go about doing that? A detainee could request discovery. In the discovery process, they could ask for resumes of the individuals that they're making a professional judgment claim against, for example. And test the state's asserted interest? And test the state's asserted interest? That was the question. That's what they would be doing, right? They would be testing whether there's a rational relationship to the state's asserted interest, right? That's correct. At least that's the facility. Would the individual's own treatment plan be part of that analysis? In terms of assessing what the legitimate state interests are? Uh-huh. I think it could be. I think the moral case really gets into this. I think the rehabilitation interest is an interest that the SEC has in administering this facility where the primary purpose is providing rehabilitation to a number of individuals. And generally applicable. I'm not trying to be difficult. And forgive me for interrupting. I'm just trying to ask whether the state's position is that that is only an institution-wide analysis or whether the state would also be asserting an interest that is aimed at the therapeutic needs of a particular detainee. Oh, I see. I think in respect to adjudicated sexually violent predators, yes, they could assert that as a legitimate interest. In terms of, and maybe this is getting into the details of Morrow, if there's some sort of invasive treatment interest that the SEC might try to force or any facility might try to force on an individual awaiting a civil detention trial, that becomes more problematic under this Court's reasoning in Morrow. Thank you. But again, I think Morrow also does make clear that if you have a generally applicable policy that takes a treatment interest or a rehabilitative interest as the legitimate state interest, those policies are defensible even if they do apply generally to pretrial detainees as well. In any event, the SEC's policies satisfy the touchstone of Turner, Youngberg, and Bell, judicial deference to policies that reasonably relate to legitimate institutional goals. It's reasonable, according to this Court's decision in Morrison v. Hall, to require return labeling be present on incoming personal mail. It's reasonable to require legal mail labeling requirements, and it's reasonable, according to Turner, to prohibit resident-to-resident correspondence. I also take issue with how counsel generalized the qualified immunity analysis in this case. I think it's important to bear in mind that qualified immunity needs to be reviewed based on the specific circumstances of each case and that the right should not be defined at too high a level of generality. And I think when you say things like a clearly established right to mail, for instance, that really doesn't capture the qualified immunity analysis appropriately. It needs to be looked at whether there's clear precedent that shows any reasonable defendant would be on notice that what they're doing violates the Constitution. So I don't think the right can be defined that generally or that broadly. And with that, we would ask the Court to determine that defendants are entitled to qualified immunity and affirm the trial court. Thank you. Can you have some rebuttal time? Thank you, Your Honors. As to some of the arguments that were surrendered or allegedly surrendered by Mr. Herrick, he was a pro se litigant. He was arguing as best he could. He didn't – you know, he doesn't have access. He's restricted from – or, sorry, he's detained, so he doesn't have access to an attorney or he didn't have access as an attorney would. Would the Court like me to provide a letter regarding Mr. Herrick's treatment plan at the time, or would that be helpful? No, I don't think at this point. If we need additional materials, we will ask the parties. Fair enough. And getting to the notices – or, sorry, the motives and actors of the defendants, kind of getting to that level of detail we think is necessary. I mean, if Mr. Herrick – any record that is not there, Mr. Herrick seems to have been able to develop. He was developing a rather lengthy record regarding information he had, but there was plenty of information that only the State had in their control that he was not able to access and not able to get into that we believe would be able to help out his case. And with that, thank you. Well, let me ask you a question. What – I don't think I'm clear on what you're asking us to do. What mail policy are you challenging here? So we were challenging 202, understanding that that has changed. I think the better way of putting that is that the policy, if it has been changed where they're not scanning it, my – Okay, let's take the scanning first. Is there anything wrong with the regulation that allows prison officials to scan legal files just to see that it's legal file? Per se, no, Your Honor. Probably not. Okay. However – All right. So in this case, as I understand it, he consented to the scanning of the legal materials. True. Not at all times. There were times when legal – Where is that in the record? I see that he says, I consented under duress, but I don't see anything there that says he didn't consent. I would argue, Your Honor, that consent with the under duress is not consent. Looking at 323 and 324, that's where I would be looking at with that. I don't think it would be appropriate or the proper policy for a state to say, you're going to let us search your legal mail. Well, they didn't search. What they said, and I think everybody can see, is that they didn't know how to handle disks. So they looked at the file folders, and they're allowed to do that on a paper basis. Right? I don't believe that that's the limited – the amount of time that was taken to look through these files suggests that they were doing more than just scanning through or flapping through that they would be looking for contraband. It was taking quite some time and then kind of being withheld from Mr. Herrick while they were doing that. Okay. What about the restriction on getting maps, that GPS maps should not be sent to the institution for security reasons? What's wrong with that? There may be a security purpose regarding the maps. We didn't, in our briefing, really delve into that issue. The concern that we would have is that it was clear, maybe not made clear on the record, but Mr. Herrick was using those for his defense, and that's what he was trying to coordinate with his attorney with those, not using them for some security purpose of escape or something like that. And many of those GPS maps weren't of the immediate area at all. They were of a different area in Washington. But you would agree that that restriction is not per se unconstitutional? No, Your Honor, that would not be. I would agree with that, yes. All right. Thank you. Thank you. Thank you. The case just argued of Herrick v. Strong is submitted. I thank you, Mr. Baldoff, for your pro bono assistance to the court. I also thank the Attorney General's Office for its argument. The next case for argument then is Herrick v. Quigley.
judges: Thomas, McKeown, Christen